1

**LEILA W. MORGAN**
California State Bar No. 232874

2

225 Broadway, Suite 900
San Diego, CA 92101-5030

3

(619) 234-8467/Fax: (619) 687-2666
E-Mail: leila_morgan@fd.org

4

5

Attorneys for Mr. Espinoza De Leon

6

7

UNITED STATES DISTRICT COURT

8

SOUTHERN DISTRICT OF CALIFORNIA

9

**(HONORABLE MARILYN L. HUFF)**

10

11

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 07CR3409-MLH |
| | ) | |
| Plaintiff, | ) | DATE:  JANUARY 28, 2007 |
| | ) | TIME:   2:00 P.M. |
| v. | ) | |
| | ) | |
| | ) | **MEMORANDUM OF POINTS AND** |
| JULIO ESPINOZA DE LEON, | ) | **AUTHORITIES IN SUPPORT OF** |
| | ) | **DEFENDANT'S MOTIONS** |
| | ) | |
| Defendant. | ) | |

12

13

14

15

16

17

18

19

I.

20

**STATEMENT OF FACTS[1]**

21

22

On October 30, 2007, Julio Espinoza De Leon entered the United States from Mexico at the

23

Otay Mesa, California Port of Entry driving a 1997 Volkswagon.  Mr. Espinoza De Leon presented

a valid border crossing card at the primary inspection booth.  Mr. Espinoza De Leon was questioned

24

regarding the ownership of the car and stated that it was his vehicle. Records checks showed that

25

the car and only a few crossings.  The primary inspection officer, then requested that Mr. De Leon

26

27

28

[1] The following is based primarily on information provided by the government.  Mr. Espinoza de Leon does not stipulate to the accuracy of these facts and reserves the right to contest these facts at any future proceeding.

1  hand him the keys to the vehicle, which he did.  Mr. Espinoza De Leon was questioned regarding

2  his destination in the United States and he explained that he was going to "La Bodega."  During

3  further inspection of the car Officer Gonzalez lifted the rear passenger side seat and observed fresh

4  paint and weld marks, eventually leading him to discover a non-factory compartment.

5  During primary inspection Canine Enforcement Officer Kenneth Lawson used his narcotics

6  detector dog to screen the vehicle.  The dog alerted to the rear passenger side quarter panel.  The

7  vehicle was then taken to secondary inspection, where a non-factory built compartment was found.

8  Inside the compartment were eight packages of methamphetamine weighing approximately 11.28

9  kilograms.

10  At approximately 10:34 a.m. Mr. Espinoza De Leon was interviewed by ICE Special Agent

11  John Mizusawa and ICE Special Agent Angela Sanchez.  Agent Sanchez read Mr. Espinoza De

12  Leon his Miranda rights in the Spanish language which he is alleged to have waived.  Duirng this

13  interview Mr. Espinoza was repeatedly told by Agent Mizusawa that he was arrested because of a

14  long-term investigation.  During this interview Mr. Espinoza repeatedly stated that he was afraid of

15  the individual who sold him the car.  He also told the agents that he had loaned the car to a friend

16  the Sunday before his arrest.  Agent Mizusawa also asked Mr. Espinoza if he agreed with the

17  statement that "we have good reason not to believe you."  Mr. Espinoza is alleged to have nodded

18  in agreement with the statement.  This interview was not video taped.

19  At approximately 4:00 p.m., approximately 7 hours after Mr. Espinoza's arrest, he was

20  interviewed again.  This interview was videotaped.  During this interview, Mr. Espinoza was not

21  informed of any of his Miranda rights.  The interview was conducted by ICE Group Supervisor,

22  Hoang Troung and ICE Special Agent Sanchez.  During the interview the agents spoke with Mr.

23  Espinoza in both English and Spanish.

24

25

26

27

28

**II.**

**THE INDICTMENT SHOULD BE DISMISSED BECAUSE JUDGE BURNS'S INSTRUCTIONS AS A WHOLE PROVIDED TO THE JANUARY 2007 GRAND JURY RUN AFOUL OF BOTH *NAVARRO-VARGAS* AND *WILLIAMS* AND VIOLATE THE FIFTH AMENDMENT BY DEPRIVING MR. ESPINOZA DE-LEON OF THE TRADITIONAL FUNCTIONING OF THE GRAND JURY**

**A.    Introduction.**

The indictment in the instant case was returned by the January 2007 grand jury.  That grand jury was instructed by the Honorable Larry A. Burns, United States District Court Judge on January 11, 2007.  See Reporter's Partial Transcript of the Proceedings, dated January 11, 2007, a copy of which is attached hereto as Exhibit A.  Judge Burns's instructions to the impaneled grand jury deviate from the instructions at issue in the major Ninth Circuit cases challenging a form grand jury instruction previously given in this district in several ways.[2]  These instructions compounded Judge Burns's erroneous instructions and comments to prospective grand jurors during voir dire of the grand jury panel, which immediately preceded the instructions at Ex. A.  See Reporter's Transcript of Proceedings, dated January 11, 2007, a copy of which is attached hereto as Exhibit B.[3]

**1.    Judge Burns Instructed Grand Jurors That Their Singular Duty Is to Determine Whether or Not Probable Cause Exists and That They Have No Right to Decline to Indict When the Probable Cause Standard Is Satisfied.**

After repeatedly emphasizing to the grand jurors that probable cause determination was their sole responsibility, see Ex. A at 3, 3-4, 5,[4] Judge Burns instructed the grand jurors that they were forbidden "from judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should be a federal law or should not be a federal law designating certain activity [as] criminal is not up to you."  See

---

[2]  See, e.g., United States v. Cortez-Rivera, 454 F.3d 1038 (9th Cir. 2006); United States v. Navarro-Vargas, 408 F.3d 1184 (9th Cir.) (en banc), cert. denied, 126 S. Ct. 736 (2005) (Navarro-Vargas II); United States v. Navarro-Vargas, 367 F.3d 896 (9th Cir. 2004)(Navarro-Vargas I); United States v. Marcucci, 299 F.3d 1156 (9th Cir. 2002) (per curiam).

[3]  The transcript of the voir dire indicates that grand jurors were shown a video presentation on the role of the grand jury.  Mr. Espinoza De Leon requests that the video presentation be produced.  See United States v. Alter, 482 F.2d 1016, 1029 n.21 (9th Cir. 1973) ("[t]he proceedings before the grand jury are secret, but the ground rules by which the grand jury conducts those proceedings are not.").

[4]  See also id. at 20 ("You're all about probable cause.").

1  id. at 8.  The instructions go beyond that, however, and tell the grand jurors that, should "you disagree with

2  that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even

3  though I think that the evidence is sufficient' or 'I'm going to vote in favor of even though the evidence may

4  be insufficient.'"  See id. at 8-9.  Thus, the instruction flatly bars the grand jury from declining to indict

5  because the grand jurors disagree with a proposed prosecution.

6       Immediately before limiting the grand jurors' powers in the way just described, Judge Burns referred

7  to an instance in the grand juror selection process in which he excused three potential jurors.  See id. at 8.

8       I've gone over this with a couple of people.  You understood from the questions and answers
       that a couple of people were excused, I think three in this case, because they could not adhere
9       to the principle that I'm about to tell you.

10  Id.  That "principle" was Judge Burns's discussion of the grand jurors' inability to give effect to their

11  disagreement with Congress.  See id. at 8-9.  Thus, Judge Burns not only instructed the grand jurors on his

12  view of their discretion; he enforced that view on pain of being excused from service as a grand juror.

13       Examination of the recently disclosed voir dire transcript, which contains additional instructions and

14  commentary in the form of the give and take between Judge Burns and various prospective grand jurors,

15  reveals how Judge Burns's emphasis of the singular duty is to determine whether or not probable cause exists

16  and his statement that grand jurors they cannot judge the wisdom of the criminal laws enacted by Congress

17  merely compounded an erroneous series of instructions already given to the grand jury venire.  In one of his

18  earliest substantive remarks, Judge Burns makes clear that the grand jury's sole function is probable cause

19  determination.

20       [T]he grand jury is determining really two factors: "do we have a reasonable belief that a
       crime was committed?  And second, do we have a reasonable belief that the person that they
21       propose that we indict committed the crime?"

22       If the answer is "yes" to both of those, then the case should move forward.  If the answer to
       either of the questions is "no," then the grand jury should not hesitate and not indict.
23

24  See Ex. B at 8.  In this passage, Judge Burns twice uses the term "should" in a context makes clear that the

25  term is employed to convey instruction: "should" cannot reasonably be read to mean optional when it

26  addresses the obligation not to indict when the grand jury has no "reasonable belief that a crime was

27  committed" or if it has no "reasonable belief that the person that they propose that we indict committed the

28  crime."

07CR3409-MLH

Equally revealing are Judge Burns's interactions with two potential grand jurors who indicated that, in some unknown set of circumstances, they might decline to indict even where there was probable cause. Because of the redactions of the grand jurors' names, Mr. Espinoza De Leon will refer to them by occupation. One is a retired clinical social worker (hereinafter CSW), and the other is a real estate agent (hereinafter REA). The CSW indicated a view that no drugs should be considered illegal and that some drug prosecutions were not an effective use of resources. <u>See id.</u> at 16. The CSW was also troubled by certain unspecified immigration cases. <u>See id.</u>

Judge Burns made no effort to determine what sorts of drug and immigration cases troubled the CSW. He never inquired as to whether the CSW was at all troubled by the sorts of cases actually filed in this district, such as drug smuggling cases and cases involving reentry after deportation and alien smuggling. Rather, he provided instructions suggesting that, in any event, any scruples CSW may have possessed were simply not capable of expression in the context of grand jury service.

> Now, the question is can you fairly evaluate [drug cases and immigration cases]? Just as the defendant is ultimately entitled to a fair trial and the person that's accused is entitled to a fair appraisal of the evidence of the case that's in front of you, so, too, is the United States entitled to a fair judgment. If there's probable cause, then the case should go forward. *I wouldn't want you to say*, "well, yeah, there's probable cause, but I still don't like what our government is doing. I disagree with these laws, so I'm not going to vote for it to go forward." If that is your frame of mind, the probably you shouldn't serve. Only you can tell me that.

<u>See id.</u> at 16-17 (emphasis added). Thus, without any sort of context whatsoever, Judge Burns let the grand juror know that he would not want him or her to decline to indict in an individual case where the grand juror "[didn't] like what our government is doing," <u>see id.</u> at 17, but in which there was probable cause. <u>See Id.</u> Such a case "should go forward." <u>See id.</u> Given that blanket proscription on grand juror discretion, made manifest by Judge Burns's use of the pronoun "I", the CSW indicated that it "would be difficult to support a charge even if [the CSW] thought the evidence warranted it." <u>See id.</u> Again, Judge Burns's question provided no context; he inquired regarding "a case," a term presumably just as applicable to possession of a small amount of medical marijuana as kilogram quantities of methamphetamine for distribution. Any grand juror listening to this exchange could only conclude that there was *no* case in which Judge Burns would permit them to vote "no bill" in the face of a showing probable cause.

07CR3409-MLH

1    Just in case there may have been a grand juror that did not understand his or her inability to exercise

2   anything like prosecutorial discretion, Judge Burns drove the point home in his exchange with REA.  REA

3   first advised Judge Burns of a concern regarding the "disparity between state and federal law" regarding

4   "medical marijuana."  See id. at 24.  Judge Burns first sought to address REA's concerns about medical

5   marijuana by stating that grand jurors, like trial jurors, are simply forbidden from taking penalty

6   considerations into account.

7       Well, those things -- the consequences of your determination shouldn't concern you in the
        sense that penalties or punishment, things like that -- we tell trial jurors, of course, that they
8       cannot consider the punishment or the consequence that Congress has set for these things.
        We'd ask you to also abide by that.  We want you to make a business-like decision of whether
9       there was a probable cause. . . .

10  Id. at 24-25.  Having stated that REA was to "abide" by the instruction given to trial jurors, Judge Burns

11  went on to suggest that REA recuse him or herself from medical marijuana cases.  See id. at 25.

12      In response to further questioning, REA disclosed REA's belief "that drugs should be legal."  See id.

13  That disclosure prompted Judge Burns to begin a discussion that ultimately led to an instruction that a grand

14  juror is obligated to vote to indict if there is probable cause.

15      I can tell you sometimes I don't agree with some of the legal decisions that are indicated that
        I have to make.  But my alternative is to vote for someone different, vote for someone that
16      supports the policies I support and get the law changed.  It's not for me to say, "well, I don't
        like it.  So I'm not going to follow it here."

17
        You'd have a similar obligation as a grand juror even though you might have to grit your
18      teeth on some cases.  Philosophically, if you were a member of congress, you'd vote against,
        for example, criminalizing marijuana.  I don't know if that's it, but you'd vote against
19      criminalizing some drugs.

20      That's not what your prerogative is here.  You're prerogative instead is to act like a judge and
        say, "all right.  This is what I've to  deal with objectively.  Does it seem to me that a crime
21      was committed?  Yes.  Does it seem to me that this person's involved?  It does." *And then
        your obligation, if you find those to be true, would be to vote in favor of the case going*
22      *forward.*

23  Id. at 26-27 (emphasis added).  Thus, the grand juror's duty is to conduct a simple two part test, which, if

24  both questions are answered in the affirmative, lead to an "obligation" to indict.

25      Having set forth the duty to indict, and being advised that REA was "uncomfortable" with that

26  paradigm, Judge Burns then set about to ensure that there was no chance of a deviation from the obligation

27  to indict in every case in which there was probable cause.

28

                                        6                                              07CR3409-MLH

1    The Court: Do you think you'd be inclined to let people go in drug cases even though you
     were convinced there was probable cause they committed a drug offense?
2    REA: It would depend on the case.
     The Court: Is there a chance that you would do that?
3    REA: Yes.
     The Court: I appreciate your answers. I'll excuse you at this time.
4

5    Id. at 27.  Two aspects of this exchange are crucial.  First, REA plainly does not intend to act solely on his

6    political belief in decriminalization -- whether he or she would indict "depend[s] on the case," see id., as it

7    should.  Because REA's vote "depend[s] on the case," see id., it is necessarily true that REA would vote to

8    indict in some (perhaps many or even nearly all) cases in which there was probable cause.  Again, Judge

9    Burns made no effort to explore REA's views; he did not ascertain what sorts of cases would prompt REA

10   to hesitate.  The message is clear: it does not matter what type of case might prompt REA's reluctance to

11   indict because, once the two part test is satisfied, the "obligation" is "to vote in favor of the case going

12   forward."[5]  See id. at 27.  That is why even the "chance," see id., that a grand juror might not vote to indict

13   was too great a risk to run.

14        **2.    The Instructions Posit a Non-Existent Prosecutorial Duty to Offer
               Exculpatory Evidence.**
15

16        In addition to his instructions on the authority to choose not to indict, Judge Burns also assured the

17   grand jurors that prosecutors would present to them evidence that tended to undercut probable cause.  See

18   Ex. A at 20.[6]

19   _____

20        [5] This point is underscored by Judge Burns's explanation to the Grand Jury that a magistrate judge
     will have determined the existence of probable cause "in most circumstances" before it has been presented
21   with any evidence.  See Ex. A at 6.  This instruction created an imprimatur of finding probable cause in each
     case because had a magistrate judge not so found, the case likely would not have been presented to the Grand
22   Jury for indictment at all.  The Grand Jury was informed that it merely was redundant to the magistrate court
     "in most circumstances."  See id.  This instruction made the grand jury more inclined to indict irrespective
23   of the evidence presented.

24        [6] These instructions were provided in the midst of several comments that praised the United States
     attorney's office and prosecutors in general.  Judge Burns advised the grand jurors that they "can expect that
25   the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and . . . they'll act in
     good faith in all matters presented to you."  See Ex. A at 27.  The instructions delivered during voir dire go
26   even further.  In addressing a prospective grand juror who revealed "a strong bias for the U.S. Attorney,
     whatever cases they might bring," see Ex. B at 38, Judge Burns affirmatively endorsed the prospective juror's
27   view of the U.S. Attorney's office, even while purporting to discourage it: "frankly, I agree with the things
     you are saying.  They make sense to me."  See id. at 43.  See also id. at 40 ("You were saying that you give
28

07CR3409-MLH

Now, again, this emphasizes the difference between the function of the grand jury and the trial jury. You're all about probable cause. If you think that there's evidence out there that might cause you to say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence.*

Id. (emphasis added).

The antecedent to this instruction is also found in the voir dire. After advising the grand jurors that "the presentation of evidence to the grand jury is necessarily one-sided," see Ex. B at 14, Judge Burns gratuitously added that "[his] experience is that the prosecutors don't play hide-the-ball. If there's something adverse or that cuts against the charge, you'll be informed of that. They have a duty to do that." See id. Thus, Judge Burns unequivocally advised the grand jurors that the government would present any evidence that was "adverse" or "that cuts against the charge." See id.

**B.    Navarro-Vargas Establishes Limits on the Ability of Judges to Constrain the Powers of the Grand Jury, Which Judge Burns Far Exceeded in His Instructions as a Whole During Impanelment.**

The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions given to grand jurors in the Southern District of California. See Navarro-Vargas II, 408 F.3d 1184. While the Ninth Circuit has thus far (narrowly) rejected such challenges, it has, in the course of adopting a highly formalistic

---

a presumption of good faith to the U.S. Attorney and assume, quite logically, that they're not about the business of trying to indict innocent people or people that they believe to be innocent or the evidence doesn't substantiate the charges against.").

Judge Burns's discussion of his once having been a prosecutor before the Grand Jury compounded the error inherent in his praising of the government attorneys. See Ex. A at 9-10. Judge Burns's instructions implied that as a prior prosecutor and current "jury liaison judge," see id. at 8, he would not allow the government attorneys to act inappropriately or to present cases for indictment where no probable cause existed.

In addition, while Judge Burns instructed the Grand Jury that it had the power to question witnesses, Judge Burns's instructions also told the Grand Jury that it should "be deferential to the U.S. Attorney if there is an instance where the U.S. Attorney thinks a question ought not to be asked." See Ex. A at 12. As the dissent in Navarro-Vargas pointed out, "the grand jury's independence is diluted by [such an] instruction, which encourages deference to prosecutors." Navarro-Vargas, 408 F.3d at 1215. The judge's admonition that his statement was only "advice," see Ex A at 12, does not cure the error as courts regularly presume grand jurors follow instructions provided to them by the court. See id. at 1202, n.23 ("We must presume that grand jurors will follow instructions because, in fact, we are prohibited from examining jurors to verify whether they understood the instruction as given and then followed it.").

1  approach[7] to the problems posed by the instructions, endorsed many of the substantive arguments raised by

2  the defendants in those cases.  The district court's instructions cannot be reconciled with the role of the grand

3  jury as set forth in Navarro-Vargas II.  Taken together, the voir dire of and instructions given to the January

4  2007 Grand Jury, go far beyond those at issue in Navarro-Vargas, taking a giant leap in the direction of a

5  bureaucratic, deferential grand jury, focused solely upon probable cause determinations and utterly unable

6  to exercise any quasi-prosecutorial discretion.  That is not the institution the Framers envisioned.  See United

7  States v. Williams, 504 U.S. 36, 49 (1992).

8          For instance, with respect to the grand jury's relationship with the prosecution, the Navarro-Vargas

9  II majority acknowledges that the two institutions perform similar functions: "'the public prosecutor, in

10  deciding whether a particular prosecution shall be instituted or followed up, performs much the same

11  function as a grand jury.'"  Navarro-Vargas II, 408 F.3d at 1200 (quoting Butz v. Economou, 438 F.3d 478,

12  510 (1978)).  Accord United States v. Navarro-Vargas, 367 F.3d 896, 900 (9th Cir. 2004) (Navarro-Vargas

13  I)(Kozinski, J., dissenting) (The grand jury's discretion in this regard "is most accurately described as

14  prosecutorial." ).  See also Navarro-Vargas II, 408 F.3d at 1213 (Hawkins, J., dissenting).  It recognizes that

15  the prosecutor is not obligated to proceed on any indictment or presentment returned by a grand jury, id.,

16  but also that "the grand jury has no obligation to prepare a presentment or to return an indictment drafted

17  by the prosecutor."  Id.  See Niki Kuckes, The Democratic Prosecutor:  Explaining the Constitutional

18  Function of the Federal Grand Jury, 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's discretion not to indict

19  was "'arguably . . . the most important attribute of grand jury review from the perspective of those who

20  insisted that a grand jury clause be included in the Bill of Rights'") (quoting Wayne LaFave et al., Criminal

21  Procedure § 15.2(g) (2d ed. 1999)).

22          Indeed, the Navarro-Vargas II majority agrees that the grand jury possesses all the attributes set forth

23  in Vasquez v. Hillery, 474 U.S. 254 (1986).  See id.

24          The grand jury thus determines not only whether probable cause exists, but also whether to
           "charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps

25

26
       _____

27      [7]  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the majority
       because "[t]he instruction's use of the word 'should' is most likely to be understood as imposing an inflexible
       'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").

28

1     most significant of all, a capital offense or a non-capital offense -- all on the basis of the
2     same facts.  And, significantly, the grand jury may refuse to return an indictment even
   "'where a conviction can be obtained.'"

3  Id. (quoting Vasquez, 474 U.S. at 263).  The Supreme Court has itself reaffirmed Vasquez's description of

4  the grand jury's attributes in Campbell v. Louisiana, 523 U.S. 392 (1998), noting that the grand jury "controls

5  not only the initial decision to indict, but also significant questions such as how many counts to charge and

6  whether to charge a greater or lesser offense, including the important decision whether to charge a capital

7  crime."  Id. at 399 (citing Vasquez, 474 U.S. at 263).  Judge Hawkins notes that the Navarro-Vargas II

8  majority accepts the major premise of Vasquez: "the majority agrees that a grand jury has the power to refuse

9  to indict someone even when the prosecutor has established probable cause that this individual has

10  committed a crime."  See id. at 1214 (Hawkins, J., dissenting).  Accord Navarro-Vargas I, 367 F.3d at 899

11  (Kozinski, J., dissenting); United States v. Marcucci, 299 F.3d 1156, 1166-73 (9th Cir. 2002) (per curiam)

12  (Hawkins, J., dissenting).  In short, the grand jurors' prerogative not to indict enjoys strong support in the

13  Ninth Circuit.  But not in Judge Burns's instructions.

14  **C.    Judge Burns's Instructions Forbid the Exercise of Grand Jury Discretion Established
     in Both *Vasquez* and *Navarro-Vargas II*.**
15

16       The Navarro-Vargas II majority found that the instruction in that case "leave[s] room for the grand

17  jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its previous

18  decision in Marcucci.  Marcucci reasoned that the instructions do not mandate that grand jurors indict upon

19  every finding of probable cause because the term "should" may mean "what is probable or expected."  299

20  F.3d at 1164 (citation omitted).  That reading of the term "should" makes no sense in context, as Judge

21  Hawkins ably pointed out.  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) ("The

22  instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or

23  obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").  See

24  also id. ("The 'word' should is used to express a duty [or] obligation.") (quoting The Oxford American

25  Diction and Language Guide 1579 (1999) (brackets in original)).

26       The debate about what the word "should" means is irrelevant here; the instructions here make no

27  such fine distinction.  The grand jury instructions make it painfully clear that grand jurors simply may not

28  choose not to indict in the event of what appears to them to be an unfair application of the law: should "you

07CR3409-MLH

1  disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against

2  indicting even though I think that the evidence is sufficient'...." See Ex. A at 8-9. Thus, the instruction flatly

3  bars the grand jury from declining to indict because they disagree with a proposed prosecution. No grand

4  juror would read this language as instructing, or even allowing, him or her to assess "the need to indict."

5  Vasquez, 474 U.S. at 264.

6      While Judge Burns used the word "should" instead of "shall" during voir dire with respect to whether

7  an indictment was required if probable cause existed, see Ex. B at 4, 8, n context, it is clear that he could

8  only mean "should" in the obligatory sense. For example, when addressing a prospective juror, Judge Burns

9  not only told the jurors that they "should" indict if there is probable cause, he told them that if there is not

10  probable cause, "then the grand jury should hesitate and not indict." See id. at 8. At least in context, it

11  would strain credulity to suggest that Judge Burns was using "should" for the purpose of "leaving room for

12  the grand jury to [indict] even if it finds [no] probable cause." See Navarro-Vargas, 408 F.3d at 1205.

13  Clearly he was not.

14      The full passage cited above effectively eliminates any possibility that Judge Burns intended the

15  Navarro-Vargas spin on the word "should."

16      [T]he grand jury is determining really two factors: "do we have a reasonable belief that a
       crime was committed? And second, do we have a reasonable belief that the person that they
17     propose that we indict committed the crime?"

18      If the answer is "yes" to both of those, then the case should move forward. If the answer to
       either of the questions is "no," then the grand jury should not hesitate and not indict.
19

20  See Ex. B at 8. Of the two sentences containing the word "should," the latter of the two essentially states

21  that if there is no probable cause, you *should* not indict. Judge Burns could not possibly have intended to

22  "leav[e] room for the grand jury to [indict] even if it finds [no] probable cause." See Navarro-Vargas, 408

23  F.3d at 1205 (citing Marcucci, 299 F.3d at 1159). That would contravene the grand jury's historic role of

24  protecting the innocent. See, e.g., United States v. Calandra, 414 U.S. 338, 343 (1974) (The grand jury's

25  "responsibilities continue to include both the determination whether there is probable cause and the

26  protection of citizens against unfounded criminal prosecutions.") (citation omitted).

27      By the same token, if Judge Burns said that "the case should move forward" if there is probable

28  cause, but intended to "leav[e] room for the grand jury to dismiss even if it finds probable cause," see

1  Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159), then he would have to have intended

2  two different meanings of the word "should" in the space of two consecutive sentences.  That could not have

3  been his intent.  But even if it were, no grand jury could ever have had that understanding.[8]  Jurors are not

4  presumed to be capable of sorting through internally contradictory instructions.  See generally United States

5  v. Lewis, 67 F.3d 225, 234 (9th Cir. 1995) ("where two instructions conflict, a reviewing court cannot

6  presume that the jury followed the correct one") (citation, internal quotations and brackets omitted).

7       Lest there be any room for ambiguity, on no less than four occasions, Judge Burns made it explicitly

8  clear to the grand jurors that "should" was not merely suggestive, but obligatory:

9       **(1)**    The first occasion occurred in the following exchange when Judge Burns conducted voir dire

10  and excused a potential juror (CSW):

11       The Court: . . . If there's probable cause, then the case should go forward.  I wouldn't want
         you to say, "Well, yeah, there's probable cause.  But I still don't like what the government is
12       doing.  I disagree with these laws, so I'm not going to vote for it to go forward."  If that's your
         frame of mind, then probably you shouldn't serve.  Only you can tell me that.
13       Prospective Juror: Well, I think I may fall in that category.
         The Court: In the latter category?
14       Prospective Juror: Yes.
         The Court: Where it would be difficult for you to support a charge even if you thought the
15       evidence warranted it?
         Prospective Juror: Yes.
16       The Court: I'm going to excuse you then.

17  See Ex. B at 17.  There was nothing ambiguous about the word "should" in this exchange with a prospective

18  juror.  Even if the prospective juror did not like what the government was doing in a particular case, that case

19  "should go forward" and Judge Burns expressly disapproved of any vote that might prevent that.  See id. ("I

20  wouldn't want you [to vote against such a case]").  The sanction for the possibility of independent judgment

21  was dismissal, a result that provided full deterrence of that juror's discretion and secondary deterrence as to

22  the exercise of discretion by any other prospective grand juror.

23       **(2)**    In an even more explicit example of what "should" meant, Judge Burns makes clear that it

24  there is an unbending obligation to indict if there is probable cause.  Grand jurors have no other prerogative.

25

26  _____

27       [8]  This argument does not turn on Mr. Espinoza De Leon's view that the Navarro-Vargas/Marcucci
     reading of the word "should" in the model instructions is wildly implausible.  Rather, it turns on the context
28   in which the word is employed by Judge Burns in his unique instructions, context which eliminates the
     Navarro-Vargas/Marcucci reading as a possibility.

07CR3409-MLH

1 | Court  . . . It's not for me to say, "Well, I don't like it.  So I'm not going to follow it here."

2 | You'd have a similar *obligation* as a grand juror even though you might have to grit your
3 | teeth on some cases.  Philosophically, if you were a member of Congress, you'd vote against,
  | for example, criminalizing marijuana.  I don't know if that's it, but you'd vote against
4 | criminalizing some drugs.

5 | That's not what your *prerogative* is here.  Your prerogative instead is act like a judge and to
  | say, "All right.  This is what I've got to deal with objectively.  Does it seem to me that a
6 | crime was committed?  Yes.  Does it seem to me that this person's involved? It does." *And
  | then your obligation, if you find those things to be true, would be to vote in favor of the case
7 | going forward*.

8 | Id. at 26-27 (emphasis added).  After telling this potential juror (REA) what his obligations and prerogatives

9 | were, the Court inquired as to whether "you'd be inclined to let people go on drug cases even though you

10 | were convinced there was probable cause they committed a drug offense?" Id. at 27.  The potential juror

11 | responded: "It would depend on the case." Id.  Nevertheless, that juror was excused.  Id. at 28.  Again, in this

12 | context, and contrary to the situation in Navarro-Vargas, "should" means "shall"; it is obligatory, and the

13 | juror has no prerogative to do anything other than indict if there is probable cause.

14 | Moreover, as this example demonstrates, the issue is not limited to whether the grand jury believes

15 | a particular law to be "unwise."  This juror said that any decision to indict would not depend on the law, but

16 | rather it would "depend on the case."  Thus, it is clear that Judge Burns's point was that if a juror could not

17 | indict on probable cause for *every* case, then that juror was not fit for service.  It is equally clear that the

18 | prospective juror did not dispute the "wisdom of the law;" he was prepared to indict under some factual

19 | scenarios, perhaps many.  But Judge Burns did not pursue the question of what factual scenarios troubled

20 | the prospective jurors, because his message is that there is no discretion not to indict.

21 | **(3)**     As if the preceding examples were not enough, Judge Burns continued to pound the point home

22 | that "should" meant "shall" when he told another grand juror during voir dire: "[W]hat I have to insist on

23 | is that you follow the law that's given to us by the United States Congress.  We enforce the federal laws

24 | here."  See id. at 61.

25 | **(4)**     And then again, after swearing in all the grand jurors who had already agreed to indict in every

26 | case where there was probable cause, Judge Burns reiterated that "should" means "shall" when he reminded

27 | them that "your option is not to say 'well, I'm going to vote against indicting even though I think that the

28 |

07CR3409-MLH

1    evidence is sufficient . . . . Instead your *obligation* is . . . not to bring your personal definition of what the

2    law ought to be and try to impose that through applying it in a grand jury setting." See Ex. A at 9.

3        Moreover, Judge Burns advised the grand jurors that the were forbidden from considering the

4    penalties to which indicted persons may be subject.

5        Prospective Juror (REA): ... And as far as being fair, it kind of depends on what the case is
         about because there is a disparity between state and federal law.
6        The Court:  In what regard?
         Prospective Juror: Specifically, medical marijuana.
7        The Court:  Well, those things -- the consequences of your determination shouldn't concern
         you in the sense that penalties or punishment, things like that -- *we tell trial jurors, of course,*
8        *that they cannot consider the punishment or the consequence that Congress has set for these*
         *things. We'd ask you to also abide by that.*  We want you to make a business-like decision
9        of whether there was a probable cause. ...

10   See Ex. B at 24-25 (emphasis added).  A "business-like decision of whether there was a probable cause"

11   would obviously leave no role for the consideration of penalty information.

12       The Ninth Circuit previously rejected a claim based upon the proscription against consideration of

13   penalty information based upon the same unlikely reading of the word "should" employed in Marcucci.  See

14   United States v. Cortez-Rivera, 454 F.3d 1038, 1040-41 (9th Cir. 2006).  Cortez-Rivera is inapposite for two

15   reasons.  First, Judge Burns did not use the term "should" in the passage quoted above.  Second, that context,

16   as well as his consistent use of a mandatory meaning in employing the term, eliminate the ambiguity (if there

17   ever was any) relied upon by Cortez-Rivera.  The instructions again violate Vasquez, which plainly

18   authorized consideration of penalty information.  See 474 U.S. at 263.

19       Noting can mask the undeniable fact that Judge Burns explicitly instructed the jurors time and time

20   again that they had a duty, an obligation, and a singular prerogative to indict each and every case where there

21   was probable cause.  These instructions go far beyond the holding of Navarro-Vargas and stand in direct

22   contradiction of the Supreme Court's decision in Vasquez.  Indeed, it defies credulity to suggest that a grand

23   juror hearing these instructions, and that voir dire, could possibly believe what the Supreme Court held in

24   Vasquez:

25       The grand jury does not determine only that probable cause exists to believe that a defendant
         committed a crime, or that it does not.  In the hands of the grand jury lies the power to charge
26       a greater offense or a lesser offense; numerous counts or a single count; and perhaps most
         significant of all, a capital offense or a non-capital offense – all on the basis of the same
27       facts.  Moreover, "[t]he grand jury is not bound to indict in every case where a conviction
         can be obtained."

28

07CR3409-MLH

474 U.S. at 263 (quoting <u>United States v. Ciambrone</u>, 601 F.2d 616, 629 (2nd Cir. 1979) (Friendly, J., dissenting)); <u>accord</u> <u>Campbell v. Louisiana</u>, 523 U.S. 392, 399 (1998) (The grand jury "controls not only the initial decision to indict, but also significant decisions such as how many counts to charge and whether to charge a greater or lesser offense, including the important decision whether to charge a capital crime."). Nor would the January 2007 grand jury ever believe that it was empowered to assess the "the need to indict." <u>See</u> <u>id.</u> at 264. Judge Burns's grand jury is not <u>Vasquez</u>'s grand jury. The instructions therefore represent structural constitutional error "that interferes with the grand jury's independence and the integrity of the grand jury proceeding." <u>See</u> <u>United States v. Isgro</u>, 974 F.2d 1091, 1094 (9th Cir. 1992). The indictment must therefore be dismissed. <u>Id.</u>

The <u>Navarro-Vargas II</u> majority's faith in the structure of the grand jury *is not* a cure for the instructions excesses. The <u>Navarro-Vargas II</u> majority attributes "[t]he grand jury's discretion -- its independence -- [to] the absolute secrecy of its deliberations and vote and the unreviewability of its decisions." 408 F.3d at 1200. As a result, the majority discounts the effect that a judge's instructions may have on a grand jury because "it is the *structure* of the grand jury process and its *function* that make it independent." <u>Id.</u> at 1202 (emphases in the original).

Judge Hawkins sharply criticized this approach. The majority, he explains, "believes that the 'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and unreviewability of many of its decisions -- sufficiently protects that power." <u>See</u> <u>id.</u> at 1214 (Hawkins, J., dissenting). The flaw in the majority's analysis is that "[i]nstructing a grand jury that it lacks power to do anything beyond making a probable cause determination ... unconstitutionally undermines the very structural protections that the majority believes save[] the instruction." <u>Id.</u> After all, it is an "'almost invariable assumption of the law that jurors follow their instructions.'" <u>Id.</u> (quoting <u>Richardson v. Marsh</u>, 481 U.S. 200, 206 (1987)). If that "invariable assumption" were to hold true, then the grand jurors could not possibly fulfill the role described in <u>Vasquez</u>. Indeed, "there is something supremely cynical about saying that it is fine to give jurors erroneous instructions because nothing will happen if they disobey them." <u>Id.</u>

07CR3409-MLH

In setting forth Judge Hawkins' views, Mr. Espinoza De Leon understands that this Court may not adopt them solely because the reasoning that supports them is so much more persuasive than the majority's sophistry. Rather, he sets them forth to urge the Court *not to extend* what is already untenable reasoning.

Here, again, the question is not an obscure interpretation of the word "should", especially in light of the instructions and commentary by Judge Burns during voir dire discussed above - unaccounted for by the Court in Navarro-Vargas II because they had not yet been disclosed to the defense, but an absolute ban on the right to refuse to indict that directly conflicts with the recognition of that right in Vasquez, Campbell, and both Navarro-Vargas II opinions. Navarro-Vargas II is distinguishable on that basis, but not only that.

Judge Burns did not limit himself to denying the grand jurors the power that Vasquez plainly states they enjoy. He also excused prospective grand jurors who might have exercised that Fifth Amendment prerogative, excusing "three [jurors] in this case, because they could not adhere to [that] principle...." See Ex. A at 8; Ex. B at 17, 28. The structure of the grand jury and the secrecy of its deliberations cannot embolden grand jurors who are no longer there, likely because they expressed their willingness to act as the conscience of the community. See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (a grand jury exercising its powers under Vasquez "serves ... to protect the accused from the other branches of government by acting as the 'conscience of the community.'") (quoting Gaither v. United States, 413 F.2d 1061, 1066 & n.6 (D.C. Cir. 1969)). The federal courts possess only "very limited" power "to fashion, on their own initiative, rules of grand jury procedure," United States v. Williams, 504 U.S. 36, 50 (1992), and, here, Judge Burns has both fashioned his own rules and enforced them.

**D.    The Instructions Conflict with Williams' Holding That There Is No Duty to Present Exculpatory Evidence to the Grand Jury.**

In Williams, the defendant, although conceding that it was not required by the Fifth Amendment, argued that the federal courts should exercise their supervisory power to order prosecutors to disclose exculpatory evidence to grand jurors, or, perhaps, to find such disclosure required by Fifth Amendment common law. See 504 U.S. at 45, 51. Williams held that "as a general matter at least, no such 'supervisory' judicial authority exists." See id. at 47. Indeed, although the supervisory power may provide the authority "to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by this

07CR3409-MLH

1    Court and by Congress to ensure the integrity of the grand jury's functions,'" id. at 46 (citation omitted), it

2    does not serve as "a means of *prescribing* such standards of prosecutorial conduct in the first instance." Id.

3    at 47 (emphasis added).  The federal courts possess only "very limited" power "to fashion, on their own

4    initiative, rules of grand jury procedure."  Id. at 50.  As a consequence, Williams rejected the defendant's

5    claim, both as an exercise of supervisory power and as Fifth Amendment common law.  See id. at 51-55.

6           Despite the holding in Williams, the instructions here assure the grand jurors that prosecutors would

7    present to them evidence that tended to undercut probable cause.  See Ex. A at 20.

8           Now, again, this emphasizes the difference between the function of the grand jury and the
       trial jury.  You're all about probable cause.  If you think that there's evidence out there that
9       might cause you say "well, I don't think probable cause exists," then it's incumbent upon you
       to hear that evidence as well.  As I told you, in most instances, *the U.S. Attorneys are duty-*
10      *bound to present evidence that cuts against what they may be asking you to do if they're*
       *aware of that evidence.*

11

12   Id. (emphasis added).  Moreover, the district court later returned to the notion of the prosecutors and their

13   duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of

14   [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you."  See

15   id. at 27.  The Ninth Circuit has already concluded it is likely this final comment is "unnecessary."  See

16   Navarro-Vargas, 408 F.3d at 1207.

17          This particular instruction has a devastating effect on the grand jury's protective powers, particularly

18   if it is not true.  It begins by emphasizing the message that Navarro-Vargas II somehow concluded was not

19   conveyed by the previous instruction: "You're all about probable cause." See Ex. A at 20.  Thus, once again,

20   the grand jury is reminded that they are limited to probable cause determinations (a reminder that was

21   probably unnecessary in light of the fact that Judge Burns had already told the grand jurors that they likely

22   would be excused if they rejected this limitation).  The instruction goes on to tell the grand jurors that they

23   should consider evidence that undercuts probable cause, but also advises the grand jurors that the prosecutor

24   will present it.  The end result, then, is that grand jurors should consider evidence that goes against probable

25   cause, but, if none is presented by the government, they can  presume that there is none.  After all, "in most

26   instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking

27   you to do if they're aware of that evidence." See id.  Moreover, during voir dire, Judge Burns informed the

28   jurors that "my experience is that the prosecutors don't play hide-the-ball.  If there's something adverse or

07CR3409-MLH

1   that cuts against the charge, you'll be informed of that. *They have a duty to do that.*" See Ex. B at 14-15

2   (emphasis added).  Thus, if the exculpatory evidence existed, it necessarily would have been presented by

3   the "duty-bound" prosecutor, because the grand jurors "can expect that the U.S. Attorneys that will appear

4   in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented

5   to you." See Ex. A at 27.

6       These instructions create a presumption that, in cases where the prosecutor does not present

7   exculpatory evidence, no exculpatory evidence exists.  A grand juror's reasoning, in a case in which no

8   exculpatory evidence was presented, would proceed along these lines:

9       (1)    I have to consider evidence that undercuts probable cause.

10      (2)    The candid, honest, duty-bound prosecutor would, in good faith, have presented any such

11             evidence to me, if it existed.

12      (3)    Because no such evidence was presented to me, I may conclude that there is none.

13  Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the

14  evidence presented represents the universe of all available exculpatory evidence; if there was more, the duty-

15  bound prosecutor would have presented it.

16      The instructions, therefore, discourage investigation -- if exculpatory evidence were out there, the

17  prosecutor would present it, so investigation is a waste of time -- and provide additional support to every

18  probable cause determination: i.e., this case may be weak, but I know that there is nothing on the other side

19  of the equation because it was not presented.  A grand jury so badly misguided is no grand jury at all under

20  the Fifth Amendment.

21

22                                      **III.**

23                  **MOTION TO COMPEL DISCOVERY AND PRESERVE EVIDENCE**

24      As of the filing of these motions, the Government has provided Mr. Espinoza De Leon with limited

25  discovery.

26      Mr. Espinoza De Leon moves for the production by the government of the following discovery and

27  for the preservation of evidence.  This request is not limited to those items that the prosecutor knows of, but

28  rather includes all discovery listed below that is in the custody, control, care, or knowledge of any

1  government agency. See generally Kyles v. Whitley, 514 U.S. 419 (1995); United States v. Bryan, 868 F.2d

2  1032 (9th Cir. 1989).

3      (1)  The Defendant's Statements.  The Government must disclose to the defendant all copies of any

4  written or recorded statements made by the defendant; the substance of any statements made by the

5  defendant which the Government intends to offer in evidence at trial; any response by the defendant to

6  interrogation; the substance of any oral statements which the Government intends to introduce at trial and

7  any written summaries of the defendant's oral statements contained in the handwritten notes of the

8  Government agent; any response to any Miranda warnings which may have been given to the defendant; as

9  well as any other statements by the defendant.  Fed. R. Crim. P. 16(a)(1)(A).  The Advisory Committee

10  Notes and the 1991 amendments to Rule 16 make clear that the Government must reveal all the defendant's

11  statements, whether oral or written, regardless of whether the government intends to make any use of those

12  statements.

13      (2)  Arrest Reports, Notes and Dispatch Tapes.  The defense also specifically requests that all arrest

14  reports, notes and dispatch or any other tapes that relate to the circumstances surrounding his arrest or any

15  questioning, if such reports have not already been produced in their entirety, be turned over to him.  This

16  request includes, but is not limited to, any rough notes, records, reports, transcripts or other documents in

17  which statements of the defendant or any other discoverable material is contained.  This is all discoverable

18  under Fed. R. Crim. P. 16(a)(1)(A) and Brady v. Maryland, 373 U.S. 83 (1963).  See also Loux v.

19  United States, 389 F.2d 911 (9th Cir. 1968).  Arrest reports, investigator's notes, memos from arresting

20  officers, dispatch tapes, sworn statements, and prosecution reports pertaining to the defendant are available

21  under Fed. R. Crim. P. 16(a)(1)(B) and (C), Fed. R. Crim. P. 26.2 and 12(i).  Preservation of rough notes

22  is requested, whether or not the government deems them discoverable.

23      (3)  Brady Material.  Mr. Espinoza De Leon requests all documents, statements, agents' reports, and

24  tangible evidence favorable to the defendant on the issue of guilt and/or which affects the credibility of the

25  government's case.  Impeachment as well as exculpatory evidence falls within Brady's definition of evidence

26  favorable to the accused. United States v. Bagley, 473 U.S. 667 (1985); United States v. Agurs, 427 U.S.

27  97 (1976).

28

1  (4) <u>Any Information That May result in a Lower Sentence Under The Guidelines</u>.  As discussed

2  above, this information is discoverable under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).  This request includes

3  any cooperation or attempted cooperation by the defendant, as well as any information that could affect any

4  base offense level or specific offense characteristic under Chapter Two of the Guidelines.  Also included

5  in this request is any information relevant to a Chapter Three adjustment, a determination of the defendant's

6  criminal history, or any other application of the Guidelines.

7  (5) <u>The Defendant's Prior Record</u>.  Evidence of prior record is available under Fed. R. Crim. P.

8  16(a)(1)(B).  Counsel specifically requests a complete copy of any criminal record.

9  (6) <u>Any Proposed 404(b) Evidence</u>.  Evidence of prior similar acts is discoverable under Fed. R.

10  Crim. P. 16(a)(1)(C) and Fed. R. Evid. 404(b) and 609.  In addition, under Fed. R. Evid. 404(b), "upon

11  request of the accused, the prosecution . . . shall provide reasonable notice in advance of trial . . . of the

12  general nature . . ." of any evidence the government proposes to introduce under Fed. R. Evid. 404(b) at trial.

13  The defendant requests that such notice be given three weeks before trial in order to give the defense time

14  to adequately investigate and prepare for trial.

15  (7) <u>Evidence Seized</u>. Evidence seized as a result of any search, either warrantless or with a warrant,

16  is discoverable under Fed. R. Crim. P. 16(a)(1)(C).

17  (8) <u>Request for Preservation of Evidence</u>.  The defense specifically requests that all dispatch tapes

18  or any other physical evidence that may be destroyed, lost, or otherwise put out of the possession, custody,

19  or care of the government and which relate to the arrest or the events leading to the arrest in this case be

20  preserved.  This request includes, but is not limited to, <u>all persons who were apprehended as passengers in</u>

21  <u>the van at issue in the instant case</u>, the results of any fingerprint analysis, the defendant's personal effects,

22  the vehicle, and any other evidence seized from the defendant or any third party.  It is requested that the

23  government be ordered to <u>question</u> all the agencies and individuals involved in the prosecution and

24  investigation of this case to determine if such evidence exists, and if it does exist to inform those parties to

25  preserve any such evidence.

26  (9) <u>Tangible Objects</u>.  The defense requests, under Fed. R. Crim. P. 16(a)(1)(C) the opportunity to

27  inspect and copy as well as test, if necessary, all other documents and tangible objects, including

28  photographs, books, papers, documents, photographs of buildings or places or copies of portions thereof

07CR3409-MLH

1    which are material to the defense or intended for use in the government's case-in-chief or were obtained from

2    or belong to the defendant.  Specifically, Mr. Espinoza De Leon requests a copy of the videotape interview

3    of the material witness, if one exists.

4         (10) Evidence of Bias or Motive to Lie.  The defense requests any evidence that any prospective

5    government witness is biased or prejudiced against the defendant, or has a motive to falsify or distort his or

6    her testimony.  Pennsylvania v. Ritchie, 480 U.S. 39 (1987); United States v. Strifler, 851 F.2d 1197 (9th

7    Cir. 1988).

8         (11) Impeachment evidence.  Mr. Espinoza De Leon requests any evidence that any prospective

9    government witness has engaged in any criminal act whether or not resulting in a conviction and whether

10   any witness has made a statement favorable to the defendant.  See Fed. R. Evid. 608, 609 and 613.  Such

11   evidence is discoverable under Brady v. Maryland, supra.  See United States v. Strifler, 851 F.2d 1197 (9th

12   Cir. 1988) (witness' prior record); Thomas v. United States, 343 F.2d 49 (9th Cir. 1965) (evidence that

13   detracts from a witness' credibility).

14        (12) Evidence of Criminal Investigation of Any Government Witness. The defense requests any

15   evidence that any prospective witness is under investigation by federal, state or local authorities for any

16   criminal conduct.  United States v. Chitty, 760 F.2d 425 (2d Cir. 1985).

17        (13) Evidence Affecting Perception, Recollection, Ability to Communicate. Mr. Espinoza De Leon

18   requests any evidence, including any medical or psychiatric report or evaluation, tending to show that any

19   prospective witness's ability to perceive, remember, communicate, or tell the truth is impaired; and any

20   evidence that a witness has ever used narcotics or other controlled substance, or has ever been an alcoholic.

21   United States v. Strifler, 851 F.2d 1197 (9th Cir. 1988); Chavis v. North Carolina, 637 F.2d 213, 224 (4th

22   Cir. 1980).

23        (14) Witness Addresses.  The defense requests the name and last known address of each prospective

24   government witness.  See United States v. Napue, 834 F.2d 1311 (7th Cir. 1987); United States v. Tucker,

25   716 F.2d 576 (9th Cir. 1983) (failure to interview government witnesses by counsel is ineffective); United

26   States v. Cook, 608 F.2d 1175, 1181 (9th Cir. 1979)) (defense has equal right to talk to witnesses).  The

27   defendant also requests the name and last known address of every witness to the crime or crimes charged

28

1    (or any of the overt acts committed in furtherance thereof) who will <u>not</u> be called as a government witness.

2    <u>United States v. Cadet</u>, 727 F.2d 1453 (9th Cir. 1984).

3        (15) <u>Name of Witnesses Favorable to the Defendant</u>.  Mr. Espinoza De Leon requests the name of

4    any witness who made any arguably favorable statement concerning the defendant or who could not identify

5    him or who was unsure of his identity, or participation in the crime charged.  <u>Jackson v. Wainwright</u>, 390

6    F.2d 288 (5th Cir. 1968); <u>Chavis v. North Carolina</u>, 637 F.2d 213, 223 (4th Cir. 1980); <u>Jones v. Jago</u>, 575

7    F.2d 1164, 1168 (6th Cir.), <u>cert. denied</u>, 439 U.S. 883 (1978); <u>Hudson v. Blackburn</u>, 601 F.2d 785 (5th Cir.

8    1979), <u>cert. denied</u>, 444 U.S. 1086 (1980).

9        (16) <u>Statements Relevant to the Defense</u>.  Mr. Espinoza De Leon requests disclosure of any statement

10   that may be "relevant to any possible defense or contention" that he might assert.  <u>United States v. Bailleaux</u>,

11   685 F.2d 1105 (9th Cir. 1982).  This would include Grand Jury transcripts which are relevant to the defense

12   motion to dismiss the indictment.

13       (17) <u>Jencks Act Material</u>.  The defense requests all material to which Mr. Espinoza De Leon is

14   entitled pursuant to the Jencks Act, 18 U.S.C. § 3500, reasonably in advance of trial, including dispatch

15   tapes.  A verbal acknowledgment that "rough" notes constitute an accurate account of the witness' interview

16   is sufficient for the report or notes to qualify as a statement under § 3500(e)(1).  <u>Campbell v. United States</u>,

17   373 U.S. 487, 490-92 (1963).

18       (18) <u>Giglio Information</u>.  Pursuant to <u>Giglio v. United States</u>, 405 U.S. 150 (1972), the defendant

19   requests all statements and/or promises, expressed or implied, made to any government witnesses, in

20   exchange for their testimony in this case, and all other information which could arguably be used for the

21   impeachment of any government witnesses.

22       (19) <u>Reports of Scientific Tests or Examinations</u>.  Pursuant to Fed. R. Crim. P. 16(a)(1)(D), the

23   defendant requests the reports of all tests and examinations conducted upon the evidence in this case.

24   Including, but not limited to, any fingerprint testing done upon any evidence seized in this case, that is within

25   the possession, custody, or control of the government, the existence of which is known, or by the exercise

26   of due diligence may become known, to the attorney for the government, and which are material to the

27   preparation of the defense or are intended for use by the government as evidence in chief at the trial.

28

07CR3409-MLH

(20) <u>Henthorn Material</u>.  The defense requests that the prosecutor review the personnel files of the officers involved in his arrests, and those who will testify, and produce to him any exculpatory information at least two weeks prior to trial and one week prior to the motion hearing.  <u>See</u> <u>United States v. Henthorn</u>, 931 F.2d 29 (9th Cir. 1991).  In addition, he requests that if the government is uncertain whether certain information is to be turned over pursuant to this request, that it produce such information to the Court in advance of the trial and the motion hearing for an <u>in</u> <u>camera</u> inspection.

(21) <u>Informants and Cooperating Witnesses</u>.  Mr. Espinoza De Leon requests disclosure of the names and addresses of all informants or cooperating witnesses used or to be used in this case.  The government must disclose the informant's identity and location, as well as disclose the existence of any other percipient witness unknown or unknowable to the defense.  <u>Roviaro v. United States</u>, 353 U.S. 53, 61-62 (1957). Mr. Espinoza De Leon also requests disclosure of any information indicating bias on the part of any informant or cooperating witness.  <u>Giglio v. United States</u>, 405 U.S. 150 (1972).  Such information would include inducements, favors, payments, or threats made to the witness to secure cooperation with the authorities.

(22) <u>Expert Witnesses</u>.  The defendant requests disclosure of any expert witnesses the government intends to call at trial and "a written summary of testimony that the government intends to use," including the "witnesses' opinions, the bases and the reasons for those opinions" and his or her qualifications.  Fed. R. Crim. P. 16(a)(1)(E).

(23) <u>Residual Request</u>.  The defense intends by this discovery motion to invoke his rights to discovery to the fullest extent possible under the Federal Rules of Criminal Procedure and the Constitution and laws of the United States.  This request specifically includes all subsections of Rule 16.  Mr. Espinoza De Leon requests that the government provide him and his attorney with the above requested material sufficiently in advance of trial.

## IV.

## MOTION TO PRESERVE AND RE-WEIGH NARCOTIC EVIDENCE

Mr. Espinoza De Leon requests an order for the U.S. Government and its agents to preserve the narcotic evidence in this case and permit the defense to re-weigh any narcotic evidence.  For the Court's convenience, a proposed order is attached to these motions.

07CR3409-MLH

## V.

## REQUEST FOR LEAVE TO FILE FURTHER MOTIONS

To date, Mr. Espinoza De Leon and defense counsel have received limited discovery from the government. It is anticipated that as new information comes to light, the defense will likely find it necessary to file further motions. Specifically, Mr. Espinoza De Leon is awaiting the English transcript of the statements taken from Mr. Espinoza De Leon on the night of his arrest. Mr. Espinoza De Leon requests a further opportunity to file further motions based upon information gained through the discovery process.

## VI.

## CONCLUSION

For the reasons stated above, Mr. Espinoza De Leon moves this Court to grant his motions.


Respectfully submitted,


Dated: January 23, 2008

_/s/ Leila W. Morgan_____
**LEILA W. MORGAN**
Attorney for Mr. Espinoza De Leon
leila_morgan@fd.org

07CR3409-MLH