KAREN P. HEWITT
United States Attorney
RANDY K. JONES
Assistant U.S. Attorney
California State Bar No. 141711
Federal Office Building
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone: (619) 557-5684
email: randy.jones2@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Criminal Case No. 07CR3409-H |
| Plaintiff, | DATE: April 14, 2008<br>TIME: 2:00 p.m. |
| v. | **GOVERNMENT'S RESPONSE AND OPPOSITION TO DEFENDANT'S MOTIONS TO:** |
| JULIO ESPINOZA DE LEON, | |
| Defendant. | **1)  DISMISS INDICTMENT DUE TO THE GRAND JURY'S BEING IMPROPERLY CHARGED;**<br>**2)  COMPEL DISCOVERY;**<br>**3)  PRESERVE AND REWEIGH NARCOTICS EVIDENCE; AND**<br>**4)  TO FILE FURTHER MOTIONS** |
| | **TOGETHER WITH STATEMENT OF FACTS MEMORANDUM OF POINTS AND AUTHORITIES, AND GOVERNMENTS MOTION FOR RECIPROCAL DISCOVERY** |

COMES NOW the plaintiff, UNITED STATES OF AMERICA, by and through its counsel, Karen P. Hewitt, United States Attorney, and Randy K. Jones, Assistant United States Attorney, and hereby files its response and opposition to defendant's above-referenced motions. Said response is based upon the files and records of the case, together with the attached statement of facts, memorandum of points and authorities, and Government's motion for reciprocal discovery.

//

## I.

## STATEMENT OF THE CASE

On November 29, 2007, a federal grand jury in the Southern District of California, returned a one-count felony Indictment charging JULIO ESPINOZA DE LEON ("De Leon") with Importation of approximately 11.28 kilograms (24.81 pounds) of Methamphetamine, in violation of Title 21, U.S.C., Sections 952 and 960.

On January 28, 2008 the defendant was arraigned on the Indictment and pled not guilty.

## II.

## STATEMENT OF FACTS

A.     PRIMARY INSPECTION

On October 30, 2007 at approximately 9:05 a.m., De Leon, the sole occupant and driver of a 1997 Volkswagen Hatchback bearing Republic of Mexico, Baja California license plates AHV4400, entered the United States from the Republic of Mexico through primary inspection lane #10 at the Otay Mesa Port of Entry, Otay Mesa, California.

At primary, Customs and Border Protection Officer ("CBPO") E. Gonzalez approached the vehicle and identified himself as a law enforcement officer. After receiving a negative customs declaration from De Leon, CBPO Gonzalez asked De Leon if he owned the vehicle and he replied, "yes." CBPO Gonzalez then asked De Leon for the registration information for the vehicle. As De Leon handed him the information, CBPO Gonzalez noticed that the license plate reader at primary lane #10 had failed to read the license plates of the vehicle. CBPO Gonzalez manually entered the license plates into the Treasury Enforcement Communications Systems (TECS) and noticed that the vehicle had crossed a few times.

CBPO Gonzalez then asked De Leon to turn off the vehicle and to hand him the keys. As De Leon extended his arms out the car window to give the keys to CBPO Gonzalez, CBPO Gonzalez noticed that De Leon's hand began to shake, his eyes wandered, and he did not maintain eye contact with CBPO Gonzalez, who asked De Leon where he was going. De Leon told CBPO Gonzalez that he was going to, "La Bodega."

//

CBPO Gonzalez then began an inspection of the vehicle by lifting the rear passenger's side seat where he saw fresh paint and weld marks. As CBPO Gonzalez inspected the vehicle, De Leon was very inquisitive. CBPO Gonzalez told De Leon to keep quiet and to look straight ahead. Further inspection revealed a non-factory compartment under the undercarriage of the vehicle. CBPO Gonzalez requested and received the assistance of a narcotics detector dog to inspect the vehicle further.

### B.    CANINE DETECTOR DOG INSPECTION

CBPO Lawson and his Narcotics Detector Dog (NDD) "Henry" responded to the radio call for assistance. While CBPO Gonzalez removed De Leon from the drivers seat, CBPO Lawson screened the vehicle from the passenger side with his NDD "Henry". On the initial pass, "Henry" alerted to the odor of narcotics emanating from the rear passenger side quarter panel and responded by sitting.

### C.    SECONDARY INSPECTION

On October 30, 2007 at approximately 9:15 a.m. CBPO C. Navarro conducted a 7-point inspection of the vehicle and observed several packages through a drain plug concealed in a non-factory compartment below the rear seat. A random package was probed and a crystal-like substance was discovered in the packages. This crystal-like substance field-tested positive for methamphetamines. CBPO Navarro continued his 7-point inspection and pulled back a floor rug to reveal an access panel. CBPO Navarro removed the access panel and extracted a total of 8 packages covered in grease, carbon paper and cellophane wrap. The 8 packages weighed a total of 11.28 kilograms.

### D.    POST-ARREST STATEMENTS OF DE LEON

#### 1.    First Interview at Otay Port of Entry

On October 30, 2007, at approximately 10:34 a.m., Immigration and Customs Enforcement ("ICE") Special Agents ("SA") J. Mizusawa and A. Sanchez contacted De Leon in the detention cell at the Otay Mesa, POE. De Leon was advised of his <u>Miranda</u> rights by SA Mizusawa reading directly from a preprinted form as witnessed and translated into the Spanish language by SA Sanchez. De Leon stated that he understood his rights and waived his <u>Miranda</u> rights. De Leon then made the following statement:

> De Leon stated that he was afraid of an unknown individual that helped him purchase the vehicle. De Leon stated that he was traveling to the Global Trade Warehouse. That he was in the import/export business. That during his employment, he travels to the Global Trade Service

warehouse on a regular basis. That on October 30, 2007, he was traveling to Global Trade Service to find employment, but the employee at the warehouse was unaware that he will be visiting. That he was a former Mexican police officer, who, during his 5 years as a police officer, had come across individual drug traffickers on the streets. That he had not worked as a police officer for the past 3 years. That, "they told you I was coming, I know, I know." That "there is detail I'm leaving out but you're not gonna guard my house 24 hours." That he had no debts to pay. That he picked the car at his house the morning of October 30, 2007. That on Sunday afternoon he had loaned the vehicle to his friend. That he did not give the keys to anyone on the morning of October 30, 2007 or the night of October 29, 2007. That he had purchased the car 2 months ago with the help of a friend.

At this time, De Leon's Nextel cell phone began to ring and the Nextel displayed 126*930*15. De Leon later stated that he had borrowed $800 money from his unknown friend and that he paid back $200.

During the interview, De Leon repeatedly stated something to the effect of, "If you knew his background you will understand," commenting on his unknown friend that helped him purchase the vehicle.

De Leon was transported to the San Ysidro POE, California to further the investigation. During the ride, SA Mizusawa asked De Leon for more information on his unknown friend. De Leon stated that he was a rookie in the police department. De Leon told SA Mizusawa that he would provide more information later.

2.    Second Interview at San Ysidro Port of Entry

At approximately 4:00 p.m., ICE Group Supervisor (GS) Hoang Truong and SA Sanchez contacted De Leon at an interview room at the San Ysidro, California, Port of Entry. GS Truong interviewed De Leon as SA Sanchez witnessed and translated the interview in the Spanish language. GS Truong reminded De Leon that his Miranda rights still applied to the interview. De Leon said that he just wanted his family to be safe, and stated, "Do you thing I'm glad that I'm crossing that stuff?" "Do you think I'm glad I'm crossing that crap." De Leon cried as he made these statements.

De Leon asked to speak with his wife so that he "can have the courage to speak to the agents." De Leon stated that if he provided the name of his friend, it would reveal the facts of the investigation. De Leon told the agents the name of his friend and that his friend was arrested two years ago at the San Ysidro POE, California for smuggling drugs into the United States. De Leon said his friend "somehow" got him involved in smuggling drugs.

De Leon declined Mexican Consular notification during the interview.  De Leon  was

photographed, fingerprinted, and later transported to the Metropolitan Correctional Center in San Diego.

E.    TECS RECORDS CHECKS

On October 30, 2007 SA Mizusawa conducted a TECS Person Subject Query in reference to De

Leon with negative results and a Vehicle Subject Query in reference to MX Baja California license

plates AHV440 which revealed five border crossings in the last 3 months.

**III.**

**POINTS AND AUTHORITIES**

A.    THE GRAND JURY INSTRUCTIONS WERE NOT FAULTY,
      AND THE INDICTMENT SHOULD NOT BE DISMISSED

1.    **Introduction**

Defendant makes contentions relating to two separate instructions given to the grand jury during

its impanelment by United States District Judge Larry A. Burns on January 10, 2007.  Defendant's

Memorandum of Points and Authorities filed March 3, 2008 at 11-26 (hereafter "Memorandum").[1]

Although recognizing that the Ninth Circuit in United States v. Navarro-Vargas, 408 F.3d 1184 (9th Cir.

2005) (en banc) generally found the two grand jury instructions constitutional, Defendant here contends

Judge Burns went beyond the text of the approved instructions, and by so doing rendered them improper

to the point that the Indictment should be dismissed.

In making the arguments concerning the two separate instructions, Defendant urges this Court

to dismiss the Indictment on two separate bases relating to grand jury procedures, both of which were

discussed in United States v. Isgro, 974 F.2d 1091 (9th Cir. 1992).  Concerning the first attacked

instruction, Defendant urges this Court to dismiss the Indictment by exercising its supervisory powers

over grand jury procedures.  This is a practice the Supreme Court discourages as Defendant

acknowledges, citing United States v. Williams, 504 U.S. 36, 50 (1992) ("Given the grand jury's

_____

[2]        Defendant supplies a partial transcript of the grand jury proceedings which records
the instructions to the impaneled grand jurors after the voir dire had been conducted.  See Exhibit
A to Memorandum (hereafter "Exhibit A").  Defendant also supplies a partial transcript of the
grand jury proceedings which records the voir dire of several potential witnesses.  See Exhibit B
to Memorandum (hereafter "Exhibit B").

operational separateness from its constituting court, it should come as no surprise that we have been reluctant to invoke the judicial supervisory power as a basis for prescribing modes of grand jury procedure."). Id. Isgro reiterated:

> [A] district court may draw on its supervisory powers to dismiss an indictment. The supervisory powers doctrine "is premised on the inherent ability of the federal courts to formulate procedural rules not specifically required by the Constitution or Congress to supervise the administration of justice." Before it may invoke this power, a court must first find that the defendant is actually prejudiced by the misconduct. Absent such prejudice – that is, absent "'grave' doubt that the decision to indict was free from the substantial influence of [the misconduct]" – a dismissal is not warranted.

974 F.2d at 1094 (citation omitted, emphasis added). Concerning the second attacked instruction, in an attempt to dodge the holding in Williams, Defendant appears to base his contentions on the Constitution as a reason to dismiss the Indictment. See Memorandum at 26 ("A grand jury so badly misguided is no grand jury at all under the Fifth Amendment."). Concerning that kind of a contention, Isgro stated:

> [A] court may dismiss an indictment if it perceives constitutional error that interferes with the grand jury's independence and the integrity of the grand jury proceeding. "Constitutional error is found where the 'structural protections of the grand jury have been so compromised as to render the proceedings fundamentally unfair, allowing the presumption of prejudice' to the defendant." Constitutional error may also be found "if [the] defendant can show a history of prosecutorial misconduct that is so systematic and pervasive that it affects the fundamental fairness of the proceeding or if the independence of the grand jury is substantially infringed."

974 F.2d at 1094 (citation omitted).[2]

The portions of the two relevant instructions approved in Navarro-Vargas were:

> You cannot judge the wisdom of the criminal laws enacted by Congress, that is, whether or not there should or should not be a federal law designating certain activity as criminal. That is to be determined by Congress and not by you.

408 F.3d at 1187, 1202.

> The United States Attorney and his Assistant United States Attorneys will provide you with important service in helping you to find your way when confronted with complex legal problems. It is entirely proper that you should receive this assistance. If past experience is any indication of what to expect in the future, then you can expect candor, honesty, and good faith in matters presented by the government attorneys.

---

[3] In Isgro, the defendants choose the abrogation of constitutional rights route when asserting that prosecutors have a duty to present exculpatory evidence to grand juries. They did not prevail. 974 F.2d at 1096 ("we find that there was no abrogation of constitutional rights sufficient to support the dismissal of the indictment." (relying on Williams)).

07CR3409-H

408 F.3d at 1187, 1206.

Concerning the "wisdom of the criminal laws" instruction, the court stated it was constitutional because, among other things, "[i]f a grand jury can sit in judgment of wisdom of the policy behind a law, then the power to return a no bill in such cases is the clearest form of 'jury nullification.'"[3]  408 F.3d at 1203 (footnote omitted).  "Furthermore, the grand jury has few tools for informing itself of the policy or legal justification for the law;  it receives no briefs or arguments from the parties.   The grand jury has little but its own visceral reaction on which to judge the 'wisdom of the law.'"  Id.

Concerning the "United States Attorney and his Assistant United States Attorneys" instruction, the court stated:

> We also reject this final contention and hold that although this passage may include unnecessary language, it does not violate the Constitution.   The "candor, honesty, and good faith" language, when read in the context of the instructions as a whole, does not violate the constitutional relationship between the prosecutor and grand jury. . . .  The instructions balance the praise for the government's attorney by informing the grand jurors that some have criticized the grand jury as a "mere rubber stamp" to the prosecution and reminding them that the grand jury is "independent of the United States Attorney[.]"

408 F.3d at 1207.  Id.  "The phrase is not vouching for the prosecutor, but is closer to advising the grand jury of the presumption of regularity and good faith that the branches of government ordinarily afford each other."  Id.

### 2.    The Expanded "Wisdom of the Criminal Laws" Instruction Was Proper

Concerning whether the new grand jurors should concern themselves with the wisdom of the criminal laws enacted by Congress, Judge Burns' full instruction stated:

> You understood from the questions and answers that a couple of people were excused, I think three in this case, because they could not adhere to the principle that I'm about to tell you.

> But it's not for you to judge the wisdom of the criminal laws enacted by congress; that is, whether or not there should be a federal law or should not be a federal law designating certain activity is criminal is not up to you.   That's a judgment that

---

[4]  The Court acknowledged that as a matter of fact jury nullification does take place, and there is no way to control it.  "We recognize and do not discount that some grand jurors might in fact vote to return a no bill because they regard the law as unwise at best or even unconstitutional. For all the reasons we have discussed, there is no post hoc remedy for that; the grand jury's motives are not open to examination."  408 F.3d at 1204 (emphasis in original).

07CR3409-H

congress makes.

And if you disagree with the judgment made by congress, then your option is not to say "Well I'm going to vote against indicting even though I think that the evidence is sufficient" or "I'm going to vote in favor of even though the evidence may be insufficient." Instead, your obligation is to contact your congressman or advocate for a change in the laws, but not to bring your personal definition of what the law ought to be and try to impose that through applying it in a grand jury setting.

Exhibit A at 8-9.[4]

In line with Navarro-Vargas, Judge Burns instructed the grand jurors that they were forbidden "from judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should be a federal law or should not be a federal law designating certain activity [as] criminal is not up to you." Exhibit A at 8. Defendant claims, however, that the instructions "make it painfully clear that grand jurors simply may not choose not to indict in the event of what appears to them to be an unfair application of the law: should 'you disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient. . . .'" Memorandum at 22. Defendant contends that this addition to the approved instruction "flatly bars the grand jury from declining to indict because the grand jurors disagree with a proposed prosecution." Id. Defendant further contends that the flat prohibition was preemptively reinforced by Judge Burns when excused prospective grand jurors.

In concocting the theory of why Judge Burns erred, Defendant posits that the expanded instruction renders irrelevant the debate about what the word "should" means. Defendant contends that "the instruction flatly bars the grand jury from declining to indict because they disagree with a proposed prosecution." Memorandum at 12. This argument mixes-up two of the holdings in Navarro-Vargas in the hope they will blend into one. They do not.

Navarro-Vargas does permit flatly barring the grand jury from disagreeing with the wisdom

---

[5] The United States' Appendix recounts the excusing of the three individuals. This transcript involves the voir dire portion of the grand jury selection process, and has been redacted to include redaction of the individual names, so as to provide only the relevant three incidents wherein prospective grand jurors were excused. Specifically, the pages of the supplemental transcript supplied are: United States' Appendix at 15, line 10; 17, line 18; 24, line 14; 28, line 2; 38, line 9; and 44, line 17.

of the criminal laws.  The statement, "[y]ou cannot judge the wisdom of the criminal laws enacted by Congress," (emphasis added) authorized by Navarro-Vargas, 408 F.3d at 1187, 1202, is not an expression of discretion.  Jury nullification is forbidden although acknowledged as a sub rosa fact in grand jury proceedings.  408 F.3d at 1204.  In this respect Judge Burns was absolutely within his rights, and within the law, when he excused the three prospective grand jurors because of their expressed inability to apply the laws passed by Congress.  Similarly, it was proper for him to remind the impaneled grand jurors that they could not question the wisdom of the laws.  As we will establish, this reminder did not pressure the grand jurors to give up their discretion not to return an indictment. Judge Burns' words cannot be parsed to say that they flatly barred the grand jury from declining to indict because the grand jurors disagree with a proposed prosecution, because they do not say that. That aspect of a grand jury's discretionary power (i.e., disagreement with the prosecution) was dealt with in Navarro-Vargas in its discussion of another instruction wherein the term "should" was germane.[5]  408 F.3d at 1204-06.  This other instruction bestows discretion on the grand jury not to indict.[6]  In finding this instruction constitutional, the court stated in words that ring true here: "It is

---

[6] That instruction is not at issue here.  It read as follows:

[Y]our task is to determine whether the government's evidence as presented to you is sufficient to cause you to conclude that there is probable cause to believe that the accused is guilty of the offense charged.  To put it another way, you should vote to indict where the evidence presented to you is sufficiently strong to warrant a reasonable person's believing that the accused is probably guilty of the offense with which the accused is charged.

408 F.3d at 1187.

[7] The court upheld the instruction stating:

This instruction does not violate the grand jury's independence.  The language of the model charge does not state that the jury "must" or "shall" indict, but merely that it "should" indict if it finds probable cause.  As a matter of pure semantics, it does not "eliminate discretion on the part of the grand jurors," leaving room for the grand jury to dismiss even if it finds probable cause.

408 F.3d at 1205 (confirming holding in United States v. Marcucci, 299 F.3d 1156, 1159 (9th Cir. 2002) (per curiam)).  "In this respect, the grand jury has even greater powers of nonprosecution than the executive because there is, literally, no check on a grand jury's decision not to return an

the grand jury's position in the constitutional scheme that gives it its independence, not any instructions that a court might offer." 408 F.3d at 1206. The other instruction was also given by Judge Burns in his own fashion as follows:

> The function of the grand jury, in federal court at least, is to determine probable cause. That's the simple formulation that I mentioned to a number of you during the jury selection process. Probable cause is just an analysis of whether a crime was committed and there's a reasonable basis to believe that and whether a certain person is associated with the commission of that crime, committed it or helped commit it.

> If the answer is yes, then as grand jurors your function is to find that the probable cause is there, that the case has been substantiated, and it should move forward. If conscientiously, after listening to the evidence, you say "No, I can't form a reasonable belief has anything to do with it, then your obligation, of course, would be to decline to indict, to turn the case away and not have it go forward.

Exhibit A at 3-4.

> Probable cause means that you have an honestly held conscientious belief and that the belief is reasonable that a federal crime was committed and that the person to be indicted was somehow associated with the commission of that crime. Either they committed it themselves or they helped someone commit it or they were part of a conspiracy, an illegal agreement, to commit that crime.

> To put it another way, you should vote to indict when the evidence presented to you is sufficiently strong to warrant a reasonable person to believe that the accused is probably guilty of the offense which is proposed.

Exhibit A at 23.

While the new grand jurors were told by Judge Burns that they could not question the wisdom of the criminal laws per Navarro-Vargas, they were also told by Judge Burns they had the discretion not to return an indictment per Navarro-Vargas. Further, if a potential grand juror could not be dissuaded from questioning the wisdom of the criminal laws, that grand juror should be dismissed as a potential jury nullification advocate. See Merced v. McGrath, 426 F.3d 1076, 1079-80 (9th Cir. 2005). Thus, there was no error requiring dismissal of this Indictment or any other indictment by this Court exercising its supervisory powers.

Further, a reading of the dialogues between Judge Burns and the three excused jurors found in the supplemental transcript excerpts (see United States' Appendix filed on March 4, 2008) reflects

_____

indictment. 408 F.3d at 1206.

a measured, thoughtful, almost mutual decision, that those three individuals should not serve on the grand jury because of their views. Judge Burns' reference back to those three colloquies cannot be construed as pressuring the impaneled grand jurors, but merely bespeaks a reminder to the grand jury of their duties.

Finally, even if there was an error, Defendant has not demonstrated he was actually prejudiced thereby, a burden she has to bear. "Absent such prejudice – that is, absent 'grave' doubt that the decision to indict was free from the substantial influence of [the misconduct]' – a dismissal is not warranted." Isgro, 974 F.2d at 1094.

### 3. The Addition to the "United States Attorney and his Assistant United States Attorneys" Instruction Did Not Violate the Constitution

Concerning the new grand jurors' relationship to the United States Attorney and the Assistant U.S. Attorneys, Judge Burns variously stated:

> [T]here's a close association between the grand jury and the U.S. Attorney's Office.
>
> . . . . You'll work closely with the U.S. Attorney's Office in your investigation of cases.

Exhibit A at 11.

> [I]n my experience here in the over 20 years in this court, that kind of tension does not exist on a regular basis, that I can recall, between the U.S. Attorney and the grand juries. They generally work together.

Exhibit A at 12.

> Now, again, this emphasizes the difference between the function of the grand jury and the trial jury. You're all about probable cause. If you think that there's evidence out there that might cause you to say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well. As I told you, in most instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence.

Exhibit A at 20.[7]

---

[8] Just prior to this instruction, Judge Burns had informed the grand jurors that:

> [T]hese proceedings tend to be one-sided necessarily. . . . Because it's not a full-blown trial, you're likely in most cases not to hear the other side of the story, if there is another side to the story.

11

1

2          As a practical matter, you will work closely with government lawyers. The U.S.
    Attorney and the Assistant U.S. Attorneys will provide you with important services
3   and help you find your way when you're confronted with complex legal matters. It's
    entirely proper that you should receive the assistance from the government lawyers.

4          But at the end of the day, the decision about whether a case goes forward and
    an indictment should be returned is yours and yours alone. If past experience is any
5   indication of what to expect in the future, then you can expect that the U.S. Attorneys
    that will appear in front of you will be candid, they'll be honest, that they'll act in
6   good faith in all matters presented to you.

7   Exhibit A at 26-27.

8          Commenting on the phrase, "the U.S. Attorneys are duty-bound to present evidence that cuts

9   against what they may be asking you to do if they're aware of that evidence," Defendant proposes

10  that by making that statement, "Judge Burns also assured the grand jurors that prosecutors would

11  present to them evidence that tended to undercut probable cause." Memorandum at 17. Defendant

12  then ties this statement to the later instruction which "advis[ed] the grand jurors that they 'can expect

13  that the U.S. Attorneys that will appear in front of [them] will be candid, they'll be honest, and . . .

14  they'll act in good faith in all matters presented to you.'" Id. From this lash-up Defendant contends:

15         These instructions create a presumption that, in cases where the prosecutor
    does not present exculpatory evidence, no exculpatory evidence exists. A grand
16  juror's reasoning, in a case in which no exculpatory evidence was presented, would
    proceed along these lines:
17
           (1) I have to consider evidence that undercuts probable cause.
18
           (2) The candid, honest, duty-bound prosecutor would, in good faith,
19         have presented any such evidence to me, if it existed.

20         (3) Because no such evidence was presented to me, I may conclude
           that there is none.
21
           Even if some exculpatory evidence were presented, a grand juror would
22  necessarily presume that the evidence presented represents the universe of all
    available exculpatory evidence; if there was more, the duty-bound prosecutor would
23  have presented it.

24         The instructions therefore discourage investigation – if exculpatory evidence
    were out there, the prosecutor would present it, so investigation is a waste of time and
25  provide additional support to every probable cause determination: i.e., this case may
    be weak, but I know that there is nothing on the other side of the equation because it
26  was not presented. A grand jury so badly misguided is no grand jury at all under the
    Fifth Amendment.
27
    _____
28
    Exhibit A at 19.

07CR3409-H

Memorandum at 26.[8]

Frankly, Judge Burns' statement that "the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence," is directly contradicted by United States v. Williams, 504 U.S. 36, 51-53 (1992) ("If the grand jury has no obligation to consider all 'substantial exculpatory' evidence, we do not understand how the prosecutor can be said to have a binding obligation to present it."[9] (emphasis added)). See also United States v. Haynes, 216 F.3d 789, 798 (9th Cir. 2000) ("Finally, their challenge to the government's failure to introduce evidence impugning Fairbanks's credibility lacks merit because prosecutors have no obligation to disclose 'substantial exculpatory evidence' to a grand jury." (citing Williams) (emphasis added)).

However, the analysis does not stop there. Prior to assuming his judicial duties, Judge Burns was a member of the United States Attorney's Office, and made appearances in front of the federal

---

[9] The term "presumption" is too strong a word in this setting. The term "inference" is more appropriate. See McClean v. Moran, 963 F.2d 1306 (9th Cir. 1992) which states there are (1) permissive inferences; (2) mandatory rebuttable presumptions; and (3) mandatory conclusive presumptions, and explains the difference between the three. 963 F.2d at 1308-09 (discussing Francis v. Franklin, 471 U.S. 314 (1985); Sandstrom v. Montana, 442 U.S. 510 (1979); and Ulster County Court v. Allen, 442 U.S. 140, 157 & n. 16 (1979)). See also United States v. Warren, 25 F.3d 890, 897 (9th Cir. 1994).

[10] Note that in Williams the Court established:

> Respondent does not contend that the Fifth Amendment itself obliges the prosecutor to disclose substantial exculpatory evidence in his possession to the grand jury. Instead, building on our statement that the federal courts "may, within limits, formulate procedural rules not specifically required by the Constitution or the Congress," he argues that imposition of the Tenth Circuit's disclosure rule is supported by the courts' "supervisory power."

504 U.S. at 45 (citation omitted). The Court concluded, "we conclude that courts have no authority to prescribe such a duty [to present exculpatory evidence] pursuant to their inherent supervisory authority over their own proceedings." 504 U.S. at 55. See also United States v. Haynes, 216 F.3d 789, 797-98 (9th Cir. 2000). However, the Ninth Circuit in Isgro used Williams' holding that the supervisory powers would not be invoked to ward off an attack on grand jury procedures couched in constitutional terms. 974 F.2d at 1096.

07CR3409-H

grand jury.[10]  As such he was undoubtedly aware of the provisions in the United States Attorneys'

Manual ("USAM").[11]  Specifically, it appears he is aware of USAM Section 9-11.233, which states:

> In <u>United States v. Williams</u>, 112 S.Ct. 1735 (1992), the Supreme Court held that the Federal courts' supervisory powers over the grand jury did not include the power to make a rule allowing the dismissal of an otherwise valid indictment where the prosecutor failed to introduce substantial exculpatory evidence to a grand jury. It is the <u>policy</u> of the Department of Justice, however, that when a prosecutor conducting a grand jury inquiry is personally aware of <u>substantial evidence that directly negates the guilt</u> of a subject of the investigation, the prosecutor <u>must present or otherwise disclose</u> such evidence to the grand jury before seeking an indictment against such a person. While a failure to follow the Department's policy should <u>not result in dismissal of an indictment</u>, appellate courts <u>may refer violations of the policy to the Office of Professional Responsibility</u> for review.

(Emphasis added.)[12]  This policy was reconfirmed in USAM 9-5.001, Policy Regarding Disclosure

of Exculpatory and Impeachment Information, Paragraph "A," "this policy does not alter or supersede

the policy that requires prosecutors to disclose '<u>substantial evidence</u> that directly negates the guilt

of a subject of the investigation' to the grand jury before seeking an indictment, <u>see</u> USAM §

9-11.233." (Emphasis added.)[13]

    The facts that Judge Burns' statement contradicts <u>Williams</u>, but is in line with self-imposed

---

[11] He recalled those days when instructing the new grand jurors.  Exhibit A at 12, 14-16, 17-18.

[12] The USAM is available on the World Wide Web at www.usdoj.gov/usao/ eousa/foia_reading_room/ usam/index.html.

[13] <u>See</u> www.usdoj.gov/usao/eousa/foia_reading_room/usam/ title9/11mcrm.htm. Even if Judge Burns did not know of this provision in the USAM while he was a member of the United States Attorney's Office, because of the accessability of the USAM on the Internet, as the District Judge overseeing the grand jury he certainly could determine the required duties of the United States Attorneys appearing before the grand jury from that source.

[14] <u>See</u> www.usdoj.gov/usao/eousa/foia_reading_room/usam/title9/5mcrm.htm. Similarly, this new section does not bestow any procedural or substantive rights on defendants.

> Under this policy, the government's disclosure will exceed its constitutional obligations. This expanded disclosure policy, however, does not create a general right of discovery in criminal cases. Nor does it provide defendants with any additional rights or remedies.

USAM 9-5.001, ¶"E".  <u>See</u> www.usdoj.gov/usao/eousa/foia_reading_room/usam/title9/ 5mcrm. htm.

07CR3409-H

guidelines for United States Attorneys, does not create the constitutional crisis proposed by Defendant.  No improper presumption/inference was created when Judge Burns reiterated what he knew to be a self-imposed duty to the new grand jurors.  Simply stated, in the vast majority of the cases the reason the prosecutor does not present "substantial" exculpatory evidence, is because no "substantial" exculpatory evidence exists.[14]  If it does exist, as mandated by the USAM, the evidence should be presented to the grand jury by the Assistant U.S. Attorney upon pain of possibly having his or her career destroyed by an Office of Professional Responsibility investigation.  Even if there is some nefarious slant to the grand jury proceedings when the prosecutor does not present any "substantial" exculpatory evidence, because there is none, the negative inference created thereby in the minds of the grand jurors is legitimate.  In cases such as Defendant's, the Government has no "substantial" exculpatory evidence generated from its investigation or from submissions tendered by the defendant.[15]  There is nothing wrong in this scenario with a grand juror inferring from this state-of-affairs that there is no "substantial" exculpatory evidence, or even if some exculpatory evidence were presented, the evidence presented represents the universe of all available exculpatory evidence.

Further, just as the instruction language regarding the United States Attorney attacked in Navarro-Vargas was found to be "unnecessary language [which] does not violate the Constitution," 408 F.3d at 1207, so too the "duty-bound" statement was unnecessary when charging the grand jury concerning its relationship with the United States Attorney and her Assistant U.S. Attorneys, and does not violate the Constitution.  In United States v. Isgro, 974 F.2d 1091 (9th Cir. 1992), the Ninth

---

[15]  Recall Judge Burns also told the grand jurors that:

> [T]hese proceedings tend to be one-sided necessarily. . . . Because it's not a full-blown trial, you're likely in most cases not to hear the other side of the story, if there is another side to the story.

Exhibit A at 19.

[16]  Realistically, given "that the grand jury sits not to determine guilt or innocence, but to assess whether there is adequate basis for bringing a criminal charge [i.e. only finding probable cause]," Williams, 504 U.S. at 51 (citing United States v. Calandra, 414 U.S. 338, 343-44 (1974)), no competent defense attorney is going to preview the defendant's defense story prior to trial assuming one will be presented to a fact-finder.  Therefore, defense submissions to the grand jury will be few and far between.

Circuit while reviewing <u>Williams</u> established that there is nothing in the Constitution which requires a prosecutor to give the person under investigation the right to present anything to the grand jury (including his or her testimony or other exculpatory evidence), and the absence of that information does not require dismissal of the indictment. 974 F.2d at 1096 ("<u>Williams</u> clearly rejects the idea that there exists a right to such 'fair' or 'objective' grand jury deliberations."). That the USAM imposes a duty on United States Attorneys to present "substantial" exculpatory evidence to the grand jury is irrelevant since by its own terms the USAM excludes defendants from reaping any benefits from the self-imposed policy.[16] Therefore, while the "duty-bound" statement was an interesting tidbit of information, it was unnecessary in terms of advising the grand jurors of their rights and responsibilities, and does not cast an unconstitutional pall upon the instructions which requires dismissal of the indictment in this case or any case. The grand jurors were repeatedly instructed by Judge Burns that, in essence, the United Sates Attorneys are "good guys," which was authorized by <u>Navarro-Vargas</u>. 408 F.3d at 1206-07 ("laudatory comments . . . not vouching for the prosecutor"). But he also repeatedly "remind[ed] the grand jury that it stands between the government and the accused and is independent," which was also required by <u>Navarro-Vargas</u>. 408 F.3d at 1207. In this context the unnecessary "duty-bound" statement does not mean the instructions were constitutionally defective requiring dismissal of this indictment or any indictment.

The "duty bound" statement constitutional contentions raised by Defendant do not indicate that the "'structural protections of the grand jury have been so compromised as to render the proceedings fundamentally unfair, allowing the presumption of prejudice' to the defendant," and "[the] defendant can[not] show a history of prosecutorial misconduct that is so systematic and pervasive that it affects the fundamental fairness of the proceeding or if the independence of the grand jury is substantially infringed." <u>Isgro</u>, 974 F.2d at 1094 (citation omitted). Therefore, this Indictment, or any other indictment, need not be dismissed.

---

[17] The apparent irony is that although an Assistant U.S. Attorney will not lose a case for failure to present exculpatory information to a grand jury per <u>Williams</u>, he or she could lose his or her job with the United States Attorney's Office for such a failure per the USAM.

1    Moreover, unless Defendant can point to exculpatory evidence that the Government knew

2    about and failed to present to the grand jury, the Court should not order production of the grand jury

3    transcript of this case.

4    B.    DEFENDANT'S  MOTION TO COMPEL DISCOVERY
          AND PRESERVE EVIDENCE

5    De Leon has filed several broad requests for discovery and to preserve the evidence in this

6    case.  To simplify the response, the various items sought have been broken down into the following

7    categories: (1) items to which the Government has no objection; and (2) items to which the defendant

8    is not entitled.

9    1.    Items Which Have Been or Will Be Provided

10   (a)    copies of any statement of the defendant, whether oral, written,

11   recorded,  or videotaped;

12   (b)    copies of any arrest reports and dispatch tapes;

13   (c)    the terms of all agreements with cooperating witnesses, if they have

14   been entered into;

15   (d)    evidence of any prior similar crimes, wrongs, or acts of the defendant

16   that the Government intends to introduce under Fed. R. Crim. P. 404(b);

17   (e)    relevant exculpatory evidence, and information concerning the

18   credibility or bias of Government witnesses;

19   (f)    statements of witnesses to be called in the Government case-in-chief

20   pursuant to the Jencks Act;

21   (g)    the results of any scientific tests or examinations; reports or the experts

22   who will be called to trial to be provided at the time reciprocal discovery of any defense reports are

23   provided to the Government;

24   (h)    the opportunity to inspect all tangible evidence within the Government

25   possession, custody, or control pursuant to Fed. R. Crim. P. 16(a)(1)(C);

26

27

28

17

(i)    copies of any prior felony convictions of the defendant or witnesses for which the Government is aware.  If the defendant has knowledge that any person might have a record,  a more particularized request should be made.

(j)    copies of all search warrants and any evidence seized thereof;

(k)    all other relevant discovery required by <u>Brady</u>, <u>Giglio</u>, <u>Henthorn</u>, Jencks Act, and Rules 12 and 16 of the Federal Rules of Criminal Procedure.

2.    <u>Items To Which Defendant Is Not Entitled</u>

The Government believes the defendant is not entitled to:

(a)    the addresses of Government witnesses.  <u>United States v. Cinder</u>, 423 F.2d 904, 910 (9th Cir. 1970);

(b)    the rough notes of agents or investigating officers, although the government will move to preserve such evidence.  <u>United States v. Spencer</u>, 618 F. 2d 605 (9th Cir. 1980);

(c)    to the extent that the above does not answer all of the discovery requests made by the defendant, the Government opposes any additional discovery on the grounds that there is no authority requiring the Government to produce such material.

C.    MOTION TO PRESERVE AND RE-WEIGH NARCOTICS EVIDENCE SHOULD BE DENIED

The government does not object to the preservation and re-weigh of the marijuana seized in this case.

D.    <u>DEFENDANT'S MOTION TO GRANT LEAVE TO FILE FURTHER MOTIONS</u>

The Government does not oppose leave for filing additional motions.  The Government requests leave to file additional response and opposition papers in the event defendant is granted leave to file additional motions.

//

//

//

18

07CR3409-H

E.    GOVERNMENT'S MOTION FOR RECIPROCAL DISCOVERY

1.    Rule 16(b)

Defendant has invoked Federal Rule of Criminal Procedure 16(a) in his motion for discovery and the Government has already voluntarily complied with the requirements of Federal Rule of Criminal Procedure 16(a).  Therefore, Rule 16(b) should presently be determined to be operable as to Defendant.

The Government, pursuant to Rule 16(b), hereby requests that Defendant permit the Government to inspect, copy, and photograph any and all books, papers, documents, photographs, tangible objects, or make copies of portions thereof, which are within the possession, custody, or control of Defendant and which he intends to introduce as evidence in his case-in-chief at trial.  The Government further requests that it be permitted to inspect and copy or photograph any results or reports of physical or mental examinations and of scientific tests or experiments made in connection with this case, which are in the possession or control of Defendant, which he intends to introduce as evidence-in-chief at the trial or which were prepared by a witness whom Defendant intends to call as a witness.  The Government also requests that the Court make such orders as it deems necessary under Rule 16(d)(l) and (2) to insure that the Government receives the discovery to which it is entitled.

2.    Rule 26.2

Federal Rule of Criminal Procedure 26.2 requires the production of prior statements of all witnesses, except any statement of Defendant.  The rule provides for the reciprocal production of Jencks statements.  The time frame established by the rule requires the statement to be provided after the witness has testified, as in the Jencks Act.  Therefore, the Government hereby requests that Defendant be ordered to supply all prior statements of defense witnesses by a reasonable date before trial to be set by the Court.  This order should include any form these statements are memorialized in, including, but not limited to, tape recordings, handwritten or typed notes, and/or reports.

//

//

//

1

## IV

2

## <u>CONCLUSION</u>

3

Based on the foregoing, defendant's motions should be denied.

4

DATED:  March 31, 2008

5

Respectfully Submitted,

6

KAREN P. HEWITT
United States Attorney

7

s/ Randy K. Jones

8

_____

9

RANDY K. JONES
Assistant United States Attorney
Attorneys for Plaintiff

10

United States of America

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

07CR3409-H

1

2

3

4                              UNITED STATES DISTRICT COURT

5                          SOUTHERN DISTRICT OF CALIFORNIA

6    UNITED STATES OF AMERICA,              )              Case No. 07CR3409-H
                                            )
7                       Plaintiff,          )
                                            )
8              v.                           )
                                            )              CERTIFICATE OF SERVICE
9    JULIO ESPINOZA DE LEON,                )
                                            )
10                      Defendant.          )
                                            )
11   _____

12   IT IS HEREBY CERTIFIED THAT:

13         I, RANDY K. JONES, am a citizen of the United States and am at least eighteen years of age.

14   My business address is 880 Front Street, Room 6293, San Diego, California 92101-8893.

15         I am not a party to the above-entitled action.  I have caused service of United States'

16   Response and Opposition to Defendant's Motions Together with Statement of Facts Memorandum

17   of Points and Authorities, and Governments Motion for Reciprocal Discovery on the following party

18   by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which

19   electronically notifies them.

20   1.    Leila W. Morgan
           Federal Defenders of San Diego, Inc.          leila_morgan@fd.org
21

22         I declare under penalty of perjury that the foregoing is true and correct.

23         Executed on March 31, 2008.

                                                 s/ Randy K. Jones
24                                               RANDY K. JONES

25

26

27

28

                                                                                    07CR3409-H